McCarthy v. HHS                    CV-94-288-JD  08/09/95
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Gary McCarthy

        v.                                Civil No. 94-288-JD

Secretary, Health & Human
Services


                          O R D E R


     The plaintiff, Gary McCarthy, brings this action pursuant to

§ 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g),

seeking review of a final decision of the defendant, Secretary of

Health and Human Services ("Secretary"), denying his claim for

benefits under the Act.  Before the court are the plaintiff's

motion to reverse the Secretary's decision (document no. 9) and

the defendant's motion to affirm the Secretary's decision

(document no. 11).


                         Background[1]

     The plaintiff, born on July 24, 1956, was thirty-seven years

old when the Secretary conducted the administrative hearing.

Transcript of Administrative Record ("Tr.") at 47.  The plaintiff

has a tenth grade education, and his vocational history includes

_____

     [1]The court's recitation of the procedural and factual
background of this case is drawn from the stipulation of facts
filed jointly by the parties.

work as a roofer, a cleaner, and a fence erector.  Id. at 173. The plaintiff alleges disability due to a broken ankle, nerve and ligament damage, lower back pain, and alcohol abuse.

I.  Medical Records

On October 31, 1990, the plaintiff fell off a ladder while working on a roof, landing on and fracturing his right heel bone, known as the calcaneus.  Tr. at 248, 249.  The following day, the plaintiff was examined by Mary Sole, a physician with the Hitchcock Clinic, who placed him in a short leg cast and recommended that he elevate the foot, use crutches, and avoid placing weight on the foot.  Id. at 249.  Dr. Sole noted that the plaintiff appeared somewhat intoxicated at the time of examination.  Id.  During a follow up examination on November 30, 1990, the plaintiff reported increasing pain and irritation deep within the ankle.  Id.

On December 17, 1990, Dr. Sole removed the cast and noted that the plaintiff had a 75% range of motion, mild tenderness over the fracture site, and minimal swelling.  Tr. at 250.  The doctor also noted evidence of healing, recommended that the plaintiff place weight on the ankle, reduce his use of crutches, and undergo physical therapy.  Id.  X-rays taken at that time

2

revealed that the fracture was hardening and healing.  Id. at 252.

On January 14, 1991, Dr. Sole again examined the plaintiff and noted significant heel pain, improved swelling, and a markedly improved range of motion.  Tr. at 250.  The plaintiff had decreased his use of crutches.  Id.  X-rays revealed disuse osteoporosis and increased healing.  Id.  Dr. Sole observed continued healing of the fracture with slow recovery and recommended that the plaintiff continue physical therapy to improve his range of motion, decrease the use of crutches, and increase physical activity.  Id.

On February 11, 1991, Dr. Sole again examined the plaintiff, who continued to complain of significant pain in the lateral aspect of the foot and ankle, which the doctor related to marked heel valgus and foot pronation and lack of arch.  Tr. at 254.  The doctor also noted that the pain may be attributed to displaced fracture fragments in the lateral subtalar joint.  Id.  The plaintiff's range of motion had continued to improve and the doctor prescribed arch supports, ordered a CT scan, and indicated that the plaintiff might benefit from a subtalar fusion.  Id.

On February 25, 1991, Dr. Sole again examined the plaintiff, who was tender at the lateral heel and tendons.  Tr. at 254.  The CT scan revealed early degenerative joint disease and

3

degenerative changes in the lateral aspect of the subtalar joint, along with the comminution, or breakdown, of the subtalar joint. Id. Dr. Sole noted ankle pain secondary to scarring over the tendons around the callous, compromised by some early degenerative changes and she proposed cortisone injections if the plaintiff did not improve in three weeks. Id.

On March 18, 1991, Dr. Sole again examined the plaintiff, who demonstrated an improved range of motion with decreased pain and increased weight bearing. Tr. at 255. However, the plaintiff expressed considerable frustration as he still suffered significant pain in the ankle and could not walk for prolonged periods without the use of crutches. Id. He was tender over the peroneal tendons and lateral subtalar joint. The doctor noted the continued improvement and prescribed physical therapy and decreased use of crutches. Id.

On April 8, 1991, Dr. Sole again examined the plaintiff and noted little change in his condition. Tr. at 255-54. The doctor further noted an impression of right calcaneus fracture with residual loss of subtalar motion and evidence of inflammation around the peroneal tendon sheath. Id. The plaintiff enjoyed immediate pain relief from a cortisone injection into the peroneal sheath. Id.

4

On May 9, 1991, Dr. Sole again examined the plaintiff and noted increased pain which she attributed to increased weight-bearing and ambulation and, in particular, to pronounced pronation at mid-foot placed pressure on the lateral subtalar joint.  Tr. at 256.  The plaintiff discontinued physical therapy because the increased pain prevented his participation.  Id. at 256, 277 (physical therapy note).  Dr. Sole diagnosed status-post calcaneal fracture, healed but with subtalar joint irritation and probable peroneal tendon scarring.  Id.  She placed the plaintiff back in a short walking cast in an effort to reduce inflammation and noted that if this were successful a subtalar fusion would probably be necessary.  Id.

On May 31, 1991, Dr. Sole again examined the plaintiff, who reported less pain.  Tr. at 257.  The cast was removed and the plaintiff exhibited some limitation of motion in the subtalar joint but otherwise displayed a fairly good range of motion in the ankle.  Id.

On June 18, 1991, Dr. Sole again examined the plaintiff and noted no change in his condition.  Tr. at 257-58.  He continued to use crutches to ambulate long distances, complained of pain in the lateral heel and ankle, and reported a pop and catch of the peroneal tendons along the lateral malleolus.  Id.  The plaintiff continued to walk with marked heel valgus and barefoot and

5

midfoot pronation.  Id.  Dr. Sole noted tenderness, with a fairly good range of motion but painful subtalar motion.  Id.  X-rays were interpreted to show some irregularities in the posterior talocalcaneal joint and marked demineralization, which Nancy Beaurivage, a radiologist with the Hitchcock Clinic, suggested might be reflex sympathetic dystrophy.  Id. at 258, 261.  Dr. Beaurivage also considered a relatively minor tendon release operation.  Id.

Dr. Sole examined the plaintiff twice in July 1991.  Tr. at 262 (notes of July 25, 1991), 263 (notes of July 29, 1991).  At that time she diagnosed him with cellulitis accompanied by increased pain and swelling.  Id.  The condition was treated by seven days of antibiotics and Ansaid medication, foot elevation, and hot soaks.  Id.  Dr. Sole noted her impression of right subtalar arthritis secondary to calcaneal fracture, severe, in need of a probable subtalar fusion.  Id.  She also indicated that the plaintiff ultimately would need surgery but that such treatment could be postponed until he had some kind of insurance. Id.

Dr. Sole next examined the plaintiff on February 5, 1992, at which time she noted that he had no change in his symptoms, could not walk distances greater than fifty feet because of pain, and continued to use crutches or a cane to ambulate long distances.

6

Tr. at 264.  The plaintiff complained of pain even when not
weight-bearing, exhibited little swelling, had a limitation of
motion and tenderness at the inframalleolar and subtalar joints,
and mild discomfort in the ankle.  Id.  The doctor further noted
that diffuse burning pain accompanied all ankle motion.  Id.  Dr.
Beaurivage interpreted the X-rays to reveal some irregularities
in the posterior talus and talar calcaneal joints with no
evidence of significant arthritis in other joints.  Id. at 265.
Based on these findings and the fact that the plaintiff
complained of pain levels disproportionate to the clinical
findings, Dr. Sole indicated that the plaintiff may suffer from
reflex sympathetic dystrophy ("RSD").  Id.  The doctor
recommended a lumbar sympathetic block which she expected would
assist the plaintiff if, in fact, he did have RSD.  Id.  However,
the doctor noted that such treatment would not be helpful if the
plaintiff's diffuse osteoporosis was due to disuse, and not RSD,
in which case subtalar fusion would be a more beneficial
treatment.  Id.

The plaintiff underwent the lumbar block and Dr. Sole noted
marked initial improvement during a February 19, 1992,
examination.  Tr. at 266.  The medical record indicates that the
plaintiff was able to walk without particular pain in the ankle
but with some stiffness.  Id.  Dr. Sole suggested that should the

7

symptoms return additional lumbar blocks might be necessary for the plaintiff to resume his normal activities. Id.

On February 28, 1992, Dr. Sole diagnosed the plaintiff with a second episode of cellulitis and attendant pain and redness, which she attributed to poor circulation. Tr. at 267. The doctor, who also noted erythema on the foot, mild edema and very exquisite tenderness, prescribed antibiotics. Id.

The plaintiff returned to the Hitchcock Clinic on March 6, 1992, at which time he reported to Brian Kimball, a physician's assistant, that two days earlier someone had fallen on his right foot during a minor altercation in a bar. Tr. at 268. The plaintiff also reported that his symptoms had not improved and, in fact, that he noticed increased swelling below the medial and lateral malleolus. Id. The physician's assistant noted that the plaintiff was instructed to continue with the antibiotics, to elevate his foot, and to apply ice compresses. Id.

On March 11, 1992, Dr. Sole again examined the plaintiff, who reported good pain relief, and minimal swelling with use of Ansaid. Tr. at 270. The doctor noted normal flexion and extension of the ankle, with no inversion or eversion, and no tenderness in the foot. Id. Dr. Sole noted her impression of status-post mild cellulitis on the dorsum of the right foot, resolved, with ecchymosis secondary to contusion, which was

8

improving. Id. Dr. Sole instructed the plaintiff to schedule another lumbar block as the first one appeared to be wearing off. Id.

On October 20, 1992, the plaintiff was examined by James Shea, an orthopedic surgeon hired by the state office of disability determinations to conduct an orthopedic consultation. Tr. at 279-81. At the time the plaintiff, who was limping, complained of pain in his lower back related to the 1988 fall from the ladder, as well as pain in his right foot and ankle. Id. The plaintiff further complained of recent, nonspecific neck discomfort but otherwise indicated that his health was good. Id. Dr. Shea noted that the plaintiff was well nourished, with a normal gait and slow pace. Id. The physical examination revealed an unremarkable cervical spine, and a full range of motion with hesitation and complaints of discomfort but without muscle spasm. Id. Dr. Shea noted moderate tenderness at L3 to L5, definite atrophy of the right lower extremity, and that the plaintiff refused to walk heel to toe on the right. Id. The doctor further noted a limitation of motion in the right ankle and his right calcaneus was clinically widened, especially under the lateral malleolus. Id. Dr. Shea diagnosed a lumbar strain, and a healed calcaneal fracture of the right foot with secondary significant atrophy of the right leg. Id. Dr. Shea noted that

9

the plaintiff's ability to stand and walk was markedly limited, that his ability to sit was not limited, and that his ability to lift, carry, and bend was moderately limited.  Id.

On January 29, 1993, the plaintiff underwent a consultative psychological evaluation conducted by William Jamieson, a clinical psychologist practicing in Manchester.  Tr. at 283-85. Dr. Jamieson noted that the plaintiff was poorly groomed and dressed, appeared much older than his age, and stated that he had consumed a six pack of beer in the three hours preceding the 1 p.m. appointment.  Id.  The psychologist observed that the plaintiff was somewhat labile, alert, oriented, displayed adequate attention and cooperation, with good cooperation and effort.  Id.  The plaintiff reported that he injured his ankle and back when he fell through a roof in 1987.  Id.  He also complained of boredom and indicated that he spent all of his time at home or going to clubs and stated that he drank daily in order to sleep.  Id.  Dr. Jamieson administered testing despite the plaintiff's earlier consumption of alcohol "with the expectation that whenever the patient would be have been seen, he would be under the influence of some alcohol."  Id. at 284.  The Rorschach testing was not suggestive of thought disorders and the other testing was not suggestive of either a major depressive disorder or of disabling anxiety.  Id. at 283-85.  Dr. Jamieson diagnosed

10

the plaintiff with a generalized anxiety disorder with an underlying personality disorder and with a significant element of impulse control difficulty. Id. Dr. Jamieson further indicated that the plaintiff had limited insight, marginal judgment, was easily influenced by emotional arousal, possibly related to alcohol consumption, and was minimally capable of managing his funds. Id.

On July 31, 1993, Dr. Sole prepared an RFC assessment of the plaintiff, indicating that he was capable of lifting and carrying objects weighing up to ten pounds frequently and up to twenty five pounds occasionally, could sit without limitations, and could stand up to one hour in an eight hour day, in fifteen minute increments. Tr. at 299-303. Dr. Sole attributed these limitations to a right subtalar joint advanced post-traumatic arthritis and probable right lower extremity RSD. Id. Dr. Sole indicated that the plaintiff should avoid climbing, balancing and temperature extremes but would not encounter difficulty with fine manipulation. Id.

On August 1, 1993, Dr. Sole indicated that the plaintiff had an increased tendency to have right foot cellulitis due to chronic lymphedema because of his condition. Tr. at 304-307. She further indicated that the plaintiff needed a repeat

sympathetic block and that the symptoms of his chronic cellulitis were relieved with antibiotics.  Id.

The plaintiff was examined on August 6, 1993, by John Blowen, a nurse practitioner practicing in Manchester.  Tr. at 309.  At the time the plaintiff complained of a sore ankle and recounted a history of many and varied injuries, several related to fights, and problems related to alcohol and tobacco use.  Id. The plaintiff was not taking prescription medication.  Id.  The physical examination revealed a runny nose, sore throat, very bad teeth and gums, and alcohol on the breath.  Id.  The nurse diagnosed the plaintiff with substance abuse, post-traumatic arthritis right ankle, chronic low back pain, possible sinobronchitis, and gingivitis.  Id.  The nurse indicated that the plaintiff was unemployable mostly due to musculoskeletal problems, exacerbated by alcoholism.  Id.  The plaintiff was prescribed Naprosyn for pain and Suprax for the bronchitis.  Id.

II. Procedural Background

The plaintiff filed the current applications for benefits on September 8, 1992, claiming an inability to work since October 31, 1990.  Tr. at 132 (application for disability insurance benefits); 221 (application for supplemental security income). The applications were denied initially, id. at 146-48, 236, and

12

following reconsideration by the Social Security Administration. Id. at 164-66, 242-44. An administrative law judge ("ALJ"), before whom the plaintiff, his attorney and a vocational expert ("VE") appeared for a hearing, considered the matter de novo and, on November 19, 1993, ruled that the plaintiff was not entitled to either disability or SSI benefits. Id. at 10-24, 25-27 (decision of Klingebiel, J.).

At the administrative hearing, the plaintiff testified about his personal history, vocational experience, medical history, symptomology, daily activities and physical capabilities. The plaintiff testified that in the past he had worked as a roofer, laborer and cleaner, Tr. at 47, and he had injured his back initially when he fell through a roof in 1988 but had subsequently returned to work. Id. at 58, 60. In reference to his 1990 injury, the plaintiff testified that he shattered his ankle and heel by falling ten feet off a ladder. Id. at 49-50.

The plaintiff described his ankle pain as sharp with a severity of ten on a scale of one to ten. Tr. at 67. He rates his physical impairments in descending order of severity as his ankle, back, and shoulder. Id. at 60. The plaintiff testified that his right shoulder bothers him when he lifts it, id. at 61, and that he experiences lower back pain which runs down his legs.

13

Id. at 62. At night the plaintiff hangs his leg over the end of the bed. Id. at 57.

The plaintiff testified that he has been treated by physicians and physical therapists but continues to suffer severe and sharp ankle pain while sitting and standing. Tr. at 50-51. The treatment included a special sling or wrap which the plaintiff wears on his ankle at all times. Id. at 57. The plaintiff testified that he is limited to light duty with no lifting, no prolonged walking, no bending, no kneeling, and no squatting. Id. at 61-62. The plaintiff stated that prolonged sitting and stretching would bother his back, id. at 62, and that these symptoms would prevent him from working in a sitting job as a small parts assembler. Id.

The plaintiff testified that his treating physicians would not prescribe pain medication because of his alcohol use, Tr. at 52, but that he has received cortisone shots for the ankle pain in 1991, which were not particularly helpful, and a sympathetic lumbar block in order to reduce the nerve pain in the foot. Id. at 51. The plaintiff self-medicates with alcohol in an effort to reduce his pain and may consume up to three, six-packs of beer a day but does not drink hard liquor. Id. at 52. The plaintiff, who did not drink the day of the hearing, id. at 55-56, testified that there are periods of time in which he would go a day or two

14

without drinking. Id. at 71. The plaintiff drank heavily for a "long time" before his 1990 injury. Id. at 52. The plaintiff reported blackouts and memory problems because of his drinking, id. at 55, and, prior to his ankle injury, experienced hallucinations about seeing people. Id. at 65-66. At the time of the hearing the plaintiff testified that his beer consumption had increased so that he could fall asleep but that the pain wakes him up at all hours nonetheless. Id. at 66-67. The plaintiff often relies on his friends to purchase alcohol for him at area bars. Id. at 70. The plaintiff testified that his brothers "always ask[] me, you know, quit drinking. I say what the hell for." Id. at 71.

The plaintiff testified that he receives $111.00 worth of foodstamps each month and that the City of Manchester contributes $300 a month towards his rent. Tr. at 48. While on welfare, the city attempted to require the plaintiff to separate newspapers into piles at a recycling center but his job performance was so inadequate that he was sent home by his supervisors. Id. at 54.

The ALJ also heard testimony from Christopher Wood, a private disability case manager who appeared as an impartial vocational expert ("VE"). Based on information provided by the Secretary on the plaintiff's vocational history, Wood reported that the plaintiff's prior job as a roofer, as the plaintiff

15

performed it, is considered semi-skilled at a medium exertional level, Tr. at 74, and that the prior job as a fence erector is considered skilled at a heavy exertional level. Id.

Wood also testified in response to hypothetical questions posed by the ALJ in which he was to assume a thirty-seven year old claimant with the plaintiff's education and work experience and a functional capacity limited by an inability to stand or walk for more than fifteen minutes at a time and an inability to bend, stoop, kneel, crouch, crawl, and perform other postural activities with any frequency during the day. Tr. at 75. He was to further assume a hypothetical claimant "who perhaps would be able to lift up and carry 20 pounds maximum but . . . would not be able to handle anything more than 20 pounds." Id. Wood responded that an individual with the capabilities of the hypothetical claimant would be incapable of performing any of the plaintiff's prior jobs. Id. at 75-76. However, he testified that the hypothetical claimant could perform unskilled jobs at the sedentary level, id. at 76, and that such jobs would include bench assembly, hand packaging, polishing, buffing, grinding, hand coating and painting. Id. Specifically, Wood stated that there are approximately 5,600 bench assembly positions in New Hampshire with 200,000 in the national economy and, of these jobs, 500 in New Hampshire constitute sitting down, sedentary

16

positions with the remaining 5,100 constituting light duty positions which would require prolonged periods of standing. Id. at 76-78. With regard to the packaging position, Wood testified that there exist approximately 300 sedentary jobs in New Hampshire with 70,000 in the national economy. Id. at 78. With regard to the polishing, buffing, and grinding positions, Wood testified that there exist approximately forty-five to fifty sedentary jobs in New Hampshire with 33,000 in the national economy. Id. With regard to the hand coating and painting positions, Wood testified that there exist approximately 4,700 sedentary jobs in the national economy and, although he could not offer a specific number, the incidence of such jobs in New Hampshire "would really be insignificant." Id. at 78-79. Wood further testified that there are less than 100 "sit-down monitor or security guard types of jobs" in the New Hampshire. Id. at 79.

The ALJ next modified the hypothetical and the following colloquy took place:

> ALJ: Now, in regard to these jobs that are, as you've indicated, mostly sitting or sit-down types of jobs, if in addition to that limitation of not being able to be on their feet for more than 15 minutes or so an individual had to get up from time to time from the sitting position, that is, had to stand up and perhaps make themselves comfortable for a couple of minutes before sitting back down again, would these jobs

17

accommodate someone being able to get up, let's say every 30 minutes or every, somewhere between 30 minutes and an hour, before sitting down again or would someone have to be sitting down without any ability to interrupt the sitting position during the day?

VE:     I think that in some of the positions such as the polishing, buffing, grinding and the hand coating and painting that the production requirements might preclude changing of position.  Sometimes with the packaging, the lighter packaging, there's enough of an opportunity for change of position that just occurs naturally in the course of the job because they're, they're packaging and taking what they packaged to another station.

Tr. at 79-80.

The plaintiff's attorney next examined the VE and posed a hypothetical:

If in the moving and making comfortable the worker has to leave the work station twice an hour, which means 12 or 13 times during the workday, and by moving and making comfortable I mean he just doesn't stand up like this, he has to walk away from the station and maybe walk 10 or 15 feet one way or another to sort of maybe get the kinks out of the leg or the problem he's having with the back, would that seriously compromise his ability to do the jobs that you've identified as far as the bench assembly or the hand packaging?

Tr. at 80.  Wood responded yes, acknowledging that such additional limitations would significantly erode the number of jobs the hypothetical claimant could perform.  Id. at 81. The plaintiff's attorney next asked questions about the nature and source of the VE's statistical data, which Wood explained is

18

based on census data and the characteristics of the national labor forces.  Id.  Wood further testified that the sedentary bench assembly position constitutes less than one half a percent of all domestic jobs, id. at 81-82, and that the sedentary, sitting-down bench assembly position accounts for 500 jobs in New Hampshire, or approximately one tenth of one percent of all jobs in the state.  Id. at 82-84.

The ALJ applied the five-step sequential process applicable to a claimant's disability application.  20 C.F.R. §§ 404.1520, 416.920 (1994).[2]  The ALJ found (1) the plaintiff has not engaged in substantial gainful activity since October 31, 1990; (2) the plaintiff satisfied the disability insured status requirements of the Act on October 31, 1990, and continued to satisfy those requirements until December 30, 1992; (3) the medical evidence establishes that the plaintiff has severe

---

[2]The ALJ is required to consider the following five steps when determining if a claimant is disabled:
   (1) whether the claimant presently is engaged in substantial gainful activity;
   (2) whether the claimant has a severe impairment:
   (3) whether the impairment meets or equals a listed impairment;
   (4) whether the impairment prevents the claimant from performing past relevant work;
   (5) whether the impairment prevents the claimant from doing any other work.
20 C.F.R. § 404.1520.

impairments, including lower back pain and post-traumatic arthritis of the right ankle, but that he does not suffer from an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4; (4) the plaintiff does have a reported history of alcohol abuse but that this is not a severe impairment because he has not been identified as having an alcohol problem which would in any way interfere with his ability to perform basic work related activities since his alleged onset date; (5) the impairment prevents the plaintiff from performing his past relevant work; and (6) there are a significant number of jobs in the national economy which the plaintiff could perform, notwithstanding his impairment. Id. at 23-24. The ALJ found that the plaintiff's residual functional capacity ("RFC") would allow him to

> perform the physical exertion and nonexertional requirements of work except for lifting greater than 20 pounds, and is limited to positions which would require mostly sitting, no more than minimal standing and walking and which would allow for his need to get up approximately once each hour to change positions to relieve any discomfort which he may experience.

Id. at 23.

In addition, the ALJ found the plaintiff's claim of disabling pain to be inconsistent with the medical evidence, contradicted by his daily activities and functional activities as reported by his treating and examining sources, and not credible

20

under the criteria announced in <u>Avery v. Secretary of Health and Human Servs.</u>, 797 F.2d 19 (1st Cir. 1986). Tr. at 23. Based on these findings, the ALJ determined that the plaintiff was not under a "disability" as defined by the Act at any time through the date of the decision. <u>Id.</u> at 24.

The Appeals Council denied the plaintiff's request for review on April 22, 1994, rendering the ALJ's decision the final decision of the Secretary. Tr. at 4-5. The plaintiff filed this action on May 31, 1994, seeking a reversal of the Secretary's decision.

Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security disability decision, the factual findings of the Secretary "shall be conclusive if supported by `substantial evidence.'" <u>Irlanda Ortiz v. Secretary of Health and Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).[3] The court "`must uphold the Secretary's

---

[3]Substantial evidence is "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citing <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). "This is something less than the weight of the

findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)); accord Richardson, 402 U.S. at 401.  The record must be viewed as a whole to determine whether the decision is supported by substantial evidence.  Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Rodriguez, 647 F.2d at 222.  Moreover, "[i]t is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222); see also Burgos Lopez v. Secretary of Health and Human Servs., 747 F.2d 37, 40 (1st Cir. 1984).  The ALJ must also consider the plaintiff's subjective complaints of pain if he has "a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged."  42 U.S.C. §

_____

evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

423(d)(5)(A); <u>Avery v. Secretary of Health and Human Servs.</u>, 797 F.2d 19, 21 (1st Cir. 1986); 20 C.F.R. § 404.1529.

In his motion, the plaintiff raises three separate arguments to support his contention that the Secretary's denial of benefits was incorrect.  The defendant responds that its decision should be affirmed as the record contains substantial evidence to support its denial of benefits.  The court addresses the arguments <u>seriatim.</u>

I.    Subjective Complaints of Pain

The plaintiff first asserts that the ALJ did not properly evaluate his subjective complaints of pain and, in particular, the debilitating pain attacks allegedly related to the plaintiff's diagnosis with reflex sympathetic dystrophy ("RSD").  Plaintiff's Memorandum in Support of Motion to Reverse and Remand ("Plaintiff's Memorandum") at 16, 18.

The ALJ is required to consider the subjective complaints of pain or other symptoms by a claimant who presents a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged."  42 U.S.C. § 423(d)(5)(A); <u>Avery</u>, 797 F.2d at 21; 20 C.F.R. § 404.1529.  "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings."  <u>Dupuis v. Secretary</u>

23

of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi v. Secretary of Health and Human Servs., 764 F.2d 44, 45 (1st Cir. 1985) ("The Secretary is not required to take the claimant's assertions of pain at face value.") (quoting Burgos Lopez v. Secretary of Health and Human Servs., 747 F.2d 37, 40 (1st Cir. 1984)). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(d). A claimant's medical history and the objective medical evidence are considered reliable indicators from which the ALJ may draw reasonable conclusions regarding the intensity and persistence of the claimant's pain. Avery, 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. Id.

When a claimant complains that pain or other subjective symptoms are a significant factor limiting his ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must undertake further exploration of other information. Avery, 797 F.2d at 23. The ALJ must consider the claimants's prior work record; daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effective-

24

ness and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); Avery, 797 F.2d at 23; SSR 88-13. Moreover, when assessing credibility the ALJ may draw an inference that the claimant would have sought additional treatment if the pain was as intense as alleged. See Irlanda Ortiz, 955 F.2d at 769. If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the claimant's capacity to work. 42 U.S.C. 423(d); 20 C.F.R. 404.1529(c)(4). Finally, the court gives deference to credibility determinations made by the ALJ, particularly where the determinations are supported by specific findings. Frustaglia, 829 F.2d at 195 (citing DaRosa v. Secretary of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1985)).

The ALJ announced findings of fact which support his conclusion that the plaintiff's subjective complaints were not credible. First, the ALJ noted that the plaintiff reported in disability reports that he performs household tasks, such as cooking and cleaning, and attends private clubs in the Manchester

25

area in order to socialize with others.  Tr. at 19-20.  Second, when assessing the credibility of the allegations of pain the ALJ explicitly relied on the reports of the plaintiff's treating physician, Dr. Sole, id. at 20, who submitted an RFC assessment based on a diagnosis of "probable right lower extremity reflex sympathetic dystrophy." Id. at 299.  Thus, contrary to the plaintiff's assertion, the ALJ did consider the effect of the RSD diagnosis by explicitly relying on a treating physician assessment based on that diagnosis.  See id. at 20.  Third, the ALJ found the plaintiff's testimony at the hearing concerning shoulder pain and persistent pain radiating into his lower left extremity to be inconsistent with the bulk of his written medical history in which he complained primarily of pain in his right ankle.  Id. at 20.  The ALJ accurately observed that

> [i]t was only for purposes of his disability evaluation that he noted to Dr. Shea that he had persistent back pain since falling through a roof many years previously.  Upon examination by Dr. Shea, the claimant specifically noted that he had never had any radiation of his back pain into his lower extremities and had never had weakness or paresthesia of his legs. Nevertheless, at the hearing, the claimant testified that his back pain has been persistent with radiation into the left lower extremity.

Id.

The ALJ considered the Avery factors and, in so doing, made credibility determinations based on specific findings supported by the record.  The ALJ also had the opportunity to observe the

26

plaintiff's demeanor at the hearing and was entitled to draw inferences based on those observations. The court acknowledges that the record contains some evidence which may suggest levels of pain greater than that found by the ALJ, such as the written assessment of Nurse Blowen who, following a single examination, noted that the plaintiff suffers chronic low back pain. Id. at 309. Nonetheless, the fact that the record is not equivocal in all respects does not compromise the ALJ's credibility assessment because conflicts in the record are necessarily resolved by the Secretary and not on appeal to federal court. See Irlanda Ortiz, 955 F.2d at 769. Given the deferential standard of review, the court concludes that the specific findings along with the overall record in this case demonstrate that the ALJ's conclusion that the subjective complaints were not credible is supported by substantial evidence.

## II. Alcohol Consumption

The plaintiff next asserts that the record does not contain substantial evidence to support the ALJ's conclusion that his alcohol consumption does not constitute an addition non-exertional limitation. Plaintiff's Memorandum at 24-27.

A claimant may qualify as disabled under the Act by demonstrating that their use of alcohol has resulted in

27

behavioral or physical changes which satisfy any one of the nine impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.09 ("substance addiction disorders").  See Arroyo, 932 F.2d at 86, n.8.[4]  Proof that a substance addiction disorder has resulted in a condition that meets, or equals, one of the nine listed impairments will establish that the claimant is disabled at step three of the sequential process.  Arroyo, 932 F.2d at n.8; Calvert v. Secretary of Health and Human Servs., No. 91-291-D, slip op. at 15, n.2 (D.N.H. Jan. 22, 1992).

In addition to analysis under part 404, the First Circuit has announced an alternative basis upon which a claimant may establish a disability based on their consumption of alcohol:

> Substantial authority holds that a claimant who seeks disability benefits on grounds of alcoholism must prove that he is addicted to alcohol and has lost the ability to control his drinking.  In addition, the claimant must show that his alcoholism precludes him from engaging in substantial gainful activity.
>
> We agree that alcoholism can constitute a compensable disability under this test.  But we emphasize that even though alcoholism, by definition, imports a certain lack of control, evidence that a claimant has been diagnosed a chronic alcoholic is not sufficient to establish that the claimant has lost the ability to control his consumption of alcohol.  This inquiry requires that we determine whether claimant has so far lost the capacity for self control that he has

_____

[4]The impairments listed are: Organic Mental Disorders; Depressive Syndrome: Anxiety Disorders; Personality Disorders; Peripheral Neuropathies; Liver Damage; Pancreatitis; and Seizures.  20 C.F.R. Part 404, Subpart P, App. 1, § 12.09 (1994).

28

been "rendered impotent to seek and use means of
rehabilitation." . . . This result is consistent with
the requirements for evaluating all disability claims,
and reflects the reality that many alcoholics work.

Arroyo, 932 F.2d at 86-87 (extensive citations and quotations
omitted).  The fact that a claimant was able to remain employed
during a time period in which he was drinking heavily supports
the conclusion that the claimant had not lost the ability to
control his drinking.  Id. at 87.  Finally, the Secretary's
failure to consider this alternative basis for disability on
account of alcoholism requires the court to remand consistent
with the Arroyo analysis.  See Calvert, slip op. at 19.

The ALJ addressed in some detail the issue of the
plaintiff's alcohol consumption in his written decision and, in
so doing, performed an analysis consistent with that outlined by
the First Circuit in Arroyo.  See Tr. at 17-21.[5]  The ALJ found
that although the plaintiff testified that he has a history of
alcohol abuse, "his testimony also indicated that he does not
consume alcohol on a daily basis and did not suggest that he
would be unable to stop the use of alcohol consumption."  Id. at
17. The ALJ further found that

[t]he claimant has not required any psychological or
psychiatric treatment and has not exhibited

---

[5]The plaintiff does not assert that he has satisfied one of
the nine impairments listed in 20 C.F.R. Part 404, Subpart P,
Appendix 1, Section 12.09.

29

deficiencies in his activities of daily living as a
result of alcohol abuse.  There is no evidence that the
claimant's use of alcohol affects his ability to
function in a work environment.

Id. at 18.

The court considers whether the ALJ's findings relative to
the plaintiff's alcoholism are supported by substantial evidence.
In his brief, the plaintiff has accurately summarized the
substantial body of evidence indicating that he does, in fact,
abuse alcohol, see Plaintiff's Memorandum at 26-27, and the court
recognizes that this consumption has interfered with his life in
great measure.  The court further recognizes that the medical
records indicate reliance on alcohol, see, e.g., Tr. at 283-85,
309, and that the plaintiff's testimony at the hearing manifests
an unwillingness to quit or curtail his drinking.  Id. at 71.
However, the record also contains evidence that the plaintiff
does not drink every day, id. at 71, did not drink the day of the
hearing, id. at 55-56, and has been a heavy drinker for a "long
time" before his first injury in 1990 -- a period of time during
which he maintained steady employment.  Id. at 52.  Moreover, the
reports of Dr. Jamieson, who examined the plaintiff while
intoxicated, and the report of Dr. Rauter, explicitly take into
account the alcohol dependence but do not suggest that this
condition would prevent the plaintiff from working.  See id. at
152-163 (Rauter noting inter alia moderate limitations in ability

30

to complete workday, slight restriction of daily activities, and "impairment(s) not severe"); 283-85 (Jamieson noting inter alia no underlying thought disorder, no major depressive disorder, no disabling anxiety, but noting limitations related to insight, judgment, and anxiety). Finally, the plaintiff's treating physician of several years, Dr. Sole, does not even mention alcohol use or abuse in her RFC assessment. See id. at 299-307.

Under Arroyo the plaintiff bears the burden of establishing not only that he is an alcoholic, but also that this condition prevents him from engaging in substantial gainful activity. See 932 F.2d at 86-87. The court finds that the record contains substantial evidence to support the conclusion that the plaintiff's alcohol consumption does not interfere with his ability to perform basic work-related activities. Of course, the fact that the record may also support a contrary conclusion, i.e. that the alcohol consumption precludes the plaintiff from working, "does not prevent [the ALJ's] finding from being supported by substantial evidence." Consolo, 383 U.S. at 620. Accordingly, the plaintiff did not satisfy his burden under Arroyo and the court finds that the Secretary's rulings relative to the alcoholism do not constitute reversible error.

31

III. Step Five Analysis

The plaintiff next asserts that the testimony of the vocational expert supported a finding of disability and that, as a result, the ALJ erroneously concluded at step five of the sequential analysis that the plaintiff can perform employment which exists in significant numbers in the national economy. Plaintiff's Memorandum at 27-29. The plaintiff argues that when the ALJ revised his initial hypothetical to include the additional restrictions of not being able to stand for more than fifteen minutes and the need to change positions every thirty minutes, the VE "felt all of the jobs he identified would be excluded with the exception of the sedentary packager." Id. at 28 (citing Tr. at 80). The plaintiff further argues that the job of packager is not considered a sedentary job and, thus, the Secretary has not satisfied her burden of coming forward with evidence of a specific job that the claimant is capable of performing. Id. at 29.

The argument fails as it is based on a misreading of the hearing transcript. The plaintiff is correct that once the ALJ revised the hypothetical, the VE responded that "some of the positions" he had previously testified the hypothetical claimant could perform would no longer be appropriate given the additional limitations of not being able to stand for more than fifteen

32

minutes at a time and the need to switch positions every thirty minutes. Tr. at 79-80 (emphasis supplied). However, the VE qualified his response, noting that "some of the positions such as the polishing, buffing, grinding and the hand coating and painting that [have] . . . production requirements [which] might preclude changing of position." Id. at 80. The VE did not include the position of bench assembler in the list of those positions which the hypothetical plaintiff could perform under the original hypothetical but could not perform under the more restrictive, revised hypothetical. Compare id. at 76 (list of positions in response to original hypothetical) with id. at 80 (list of positions excluded by the additional restrictions of revised hypothetical). Thus, contrary to the plaintiff's assertion, the VE did testify to the numerical availability of at least one specific position suited to the plaintiff's capabilities and, as such, the record contains substantial evidence to support the ALJ's finding that:

> Although the claimant's additional nonexertional limitations do not allow him to perform the full range of light work . . . there are a significant number of jobs in the national economy which he could perform. Examples of such jobs are: a bench assembler with 500 jobs in the State of New Hampshire and 200,000 jobs in the national economy . . . .

<u>Id.</u> at 24.[6]

The plaintiff also asserts that the ALJ erred by failing to properly credit the VE's response to a hypothetical question posed by the plaintiff's attorney.  Plaintiff's Memorandum at 28. The plaintiff further asserts that the ALJ's hypothetical questions did not include the plaintiff's complaints of "a frequent need to lie down to relieve his ankle pain."  <u>Id.</u>

The plaintiff correctly notes that, in response to a question posed by his attorney, the VE testified that the hypothetical claimant's ability to perform the bench assembly or hand packaging position would be seriously compromised by a need to leave the work station twice an hour to walk around ten or fifteen feet and to "get the kinks out of the leg or the problem he's having with the back."  Tr. at 80.  Likewise, the court recognizes that the ALJ did not include each of the plaintiff's subjective complaints in the hypothetical questions presented to the VE.  However, neither of these correct assertions constitute reversible error as it is the role of the ALJ to "determine what evidence he credits in order to pose a hypothetical which will be

_____

[6]Given the correctness of the ALJ's finding that the plaintiff can perform the bench assembly position and that this position exists in sufficient numbers for purposes of the step five analysis, the court need not consider the plaintiff's argument that the VE erroneously testified that the hand packaging position is considered sedentary.  <u>See</u> Plaintiff's Memorandum at 28-29.

34

relevant and helpful." <u>Torres v. Secretary of Health and Human Servs.</u>, 870 F.2d 742, 745 (1st Cir. 1989) (citing <u>Arocho v. Secretary of Health and Human Servs.</u>, 670 F.2d 374, 375 (1st Cir. 1982)). The hypothetical questions specifically incorporate the limitations noted in the RFC assessment submitted by the plaintiff's own treating physician, <u>see</u> Tr. at 299-307 (report of Dr. Sole), as well as other medical evidence contained in the record. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 279-81 (report of Dr. Shea), 283-85 (report of Dr. Jamieson), 20 (decision of ALJ). Because "the ALJ was entitled to credit the vocational expert's testimony as long as there was substantial evidence in the record to support the description of claimant's impairments given in the ALJ's hypothetical," <u>Berrios Lopez v. Secretary of Health and Human Servs.</u>, 951 F.2d 427, 429 (1st Cir. 1991), the court finds no error in the failure to include additional limitations in the hypothetical questions, including limitations based in part or whole on subjective complaints of pain found not entirely credible by the ALJ following analysis under <u>Avery</u> and SSR 88-13. <u>See</u> Tr. at 20.

## Conclusion

Based on the foregoing analysis, the court finds that the Secretary did not commit reversible error as alleged by the

35

plaintiff.  The defendant's motion to affirm the decision of the Secretary (document no. 11) is granted.  The plaintiff's motion to reverse the decision (document no. 9) is denied.  This order resolves the underlying dispute between the parties and the clerk is ordered to close the case.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
Chief Judge

August 9, 1995

cc:  Raymond J. Kelly, Esquire
     David L. Broderick, Esquire